

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-20-2000

# Becker v Arco Chemical Co

Precedential or Non-Precedential:

Docket 98-1636 and 98-1888

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Becker v Arco Chemical Co" (2000). *2000 Decisions.* Paper 57.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/57

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 20, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-1636 and 98-1888

WILLIAM P. BECKER

v.

ARCO CHEMICAL COMPANY,

Appellant in No. 98-1636

WILLIAM P. BECKER

v.

ARCO CHEMICAL COMPANY,

William P. Becker,

Appellant in No. 98-1888

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Judge: Honorable Eduardo C. Robreno
(D.C. Civil No. 95-07191)

Argued January 27, 2000

BEFORE: GREENBERG, ROTH, and STAPLETON,
Circuit Judges

(Filed: March 20, 2000)

George P. Wood (argued)
Carmen R. Matos (argued)
Stewart, Wood, Branca & Matos
411 Cherry Street
Norristown, PA 19401

 Attorneys for William P. Becker

Maureen M. Rayborn
Daniel V. Johns (argued)
Niza M. Motola
Ballard Spahr Andrews &
 Ingersoll, LLP
1735 Market Street, 51st Floor

Philadelphia, PA 19103-7599

Attorneys for ARCO Chemical
Company

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter is before this court on an appeal from an order denying defendant ARCO Chemical Company's ("ARCO") motion for judgment as a matter of law, or in the alternative, for a new trial, or in the alternative, for a remittitur, entered on June 30, 1998, in this employment discrimination case following a jury verdict in favor of the plaintiff, William P. Becker ("Becker"). See Becker v. ARCO Chem. Co., 15 F. Supp.2d 600, 621 (E.D. Pa. 1998) ("Becker I"). Becker cross-appeals from the district court's order of July 23, 1998,1 which granted in part and denied in part his motion to "mold" the verdict to include post-trial

_____

1. On August 31, 1998, the district court entered an order denying Becker's motion for reconsideration of its July 23, 1998 order. While Becker's notice of appeal recites that it is from the orders of July 23, 1998, and August 31, 1998, effectively the cross-appeal is from the July 23, 1998 order on the fee petition and motion to"mold" the verdict.

2

interest on the front pay award and pre-trial interest on the back pay award, and to reflect adverse tax consequences Becker suffered by virtue of the lump sum damages award on his age discrimination claims. See Becker v. ARCO Chem. Co., 15 F. Supp.2d 621, 639-40 (E.D. Pa. 1998) ("Becker II"). Becker also cross-appeals from that aspect of the district court's July 23, 1998 order which granted in part and denied in part his petition for attorney's fees and costs. Id.

Plaintiff sued ARCO under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. SS 621 et seq., and the Pennsylvania Human Relations Act ("PHRA"), Pa. Stat. Ann., tit. 43, SS 951 et seq. (West 1991), contending that ARCO discriminated against him on the basis of his age by terminating his employment with the company on March 4, 1994. At the time of his discharge, Becker was 51 years old. After an 11-day trial which resulted in a verdict in Becker's favor, the district court on November 4, 1997, entered a judgment of $736,095.00 for Becker on the verdict.2

While the appeal and cross-appeal raise several allegations of error, we only need address one issue-- whether ARCO is entitled to a new trial under Fed. R. Civ. P. 59(a) based on the district court's admission, over ARCO's repeated objections, of Becker's testimony pertaining to the "manner" in which ARCO allegedly earlier had terminated another employee, Linwood Seaver. For convenience, we refer to Becker's testimony in this regard as "the Seaver evidence." ARCO contends that the admission of this evidence violated Fed. R. Evid. (hereinafter cited in the text as "Rule") 404(b), 403, and 608(b), and that the district court's error in admitting the testimony was not harmless.

For the reasons that follow, we hold that the district court erred by admitting the Seaver evidence pursuant to Rule 404(b). We also conclude that Rule 608(b) clearly does not provide a basis for introducing Becker's testimony on this point. Moreover, based on the record presented, we

_____

2. The total judgment represented the following amounts: (1) $186,095.00 in back pay; (2) $380,000.00 in front pay; and (3) $170,000.00 in compensatory damages.

3

cannot say that it is highly probable that the district court's admission of this evidence did not affect ARCO's substantial rights. See McQueeney v. Wilmington Trust Co., 779 F.2d 916, 924, 927-28 (3d Cir. 1985). Hence, the district court's erroneous evidentiary ruling requires us to reverse its order of June 30, 1998, insofar as it denied ARCO's motion for a new trial, and remand the matter to the district court with directions to grant a new trial on the age discrimination claims as to all issues. See id. at 931. Because we are remanding the matter for a new trial in its entirety, we will dismiss Becker's cross-appeal as moot, and we will not address ARCO's additional arguments presented in its appeal.3 See J&R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259, 1266 (3d Cir. 1994).

II. JURISDICTION and STANDARD OF REVIEW

The district court exercised subject matter jurisdiction over Becker's ADEA claim pursuant to 28 U.S.C. S 1331, and had supplemental jurisdiction over the PHRA claim pursuant to 28 U.S.C. S 1367. We exercise appellate jurisdiction over this appeal pursuant to 28 U.S.C.S 1291.

_____

3. At the outset, we note that ARCO has not challenged that aspect of

the district court's opinion and order denying its motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) based on the sufficiency of Becker's evidence of age discrimination. See Becker I, 15 F. Supp.2d at 606-09. Therefore, we will not consider whether ARCO is entitled to judgment as a matter of law on that basis. We also note that we have considered whether we could grant a partial new trial limited to the issue of ARCO's liability for age discrimination, but it is apparent to us that the issues of liability and damages are so intertwined that a new trial in its entirety is warranted in the circumstances. See Vizzini v. Ford Motor Co., 569 F.2d 754, 760 (3d Cir. 1977) (discussing circumstances in which court may grant partial new trial) (quoting Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. 494, 500, 51 S.Ct. 513, 515 (1931)); 11 Charles Alan Wright, et al., Federal Practice and Procedure, S 2814, at 150 (2d ed. 1995) ("It therefore now may be regarded as settled that if an error at trial requires a new trial on one issue, but this issue is separate from the other issues in the case and the error did not affect the determination of the other issues, the scope of the new trial may be limited to the single issue.").

4

In Bhaya v. Westinghouse Electric Corp., 922 F.2d 184 (3d Cir. 1990), we explained that when reviewing the district court's decision to grant or deny a motion for a new trial, we must give substantial deference to the trial judge's decision " `who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart.' " Id. at 187 (quoting Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 216, 67 S.Ct. 752, 755 (1947)). We also stated that "[p]articular deference" is appropriate where the decision to grant or deny a new trial rested on the district court's evidentiary ruling that itself was entrusted to the trial court's discretion. See id.; see also Link v. Mercedes-Benz of N. Am., Inc., 788 F.2d 918, 921-22 (3d Cir. 1986) ("Where a contention for a new trial is based on the admissibility of evidence, the trial court has great discretion . . . which will not be disturbed on appeal absent a finding of abuse.") (internal quotation marks omitted).

We have indicated that a finding of reversible error " `may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected.' " See Glass v. Philadelphia Elec. Co., 34 F.3d 188, 191 (3d Cir. 1994) (quoting Linkstrom v. Golden T. Farms, 883 F.2d 269, 269 (3d Cir. 1989)); see also Fed. R. Evid. 103(a); Fed. R. Civ. P. 61. "In reviewing evidentiary rulings, if we find nonconstitutional error in a civil suit, such error is harmless only `if it is highly probable that the error did not affect the outcome of the case.' " Glass, 34 F.3d at 191 (quoting Lockhart v. Westinghouse Credit Corp. , 879 F.2d 43, 53, 59 (3d Cir. 1989)).

We review the district court's decision to admit evidence of a party's "prior bad acts" (which we will call "Rule 404(b) evidence") under Rules 404(b) and 403 for an abuse of discretion. See United States v. Morley, 199 F.3d 129, 133 n.6 (3d Cir. 1999); J&R Ice Cream, 31 F.3d at 1268; see also Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 110 (3d Cir. 1999) ("We review evidentiary rulings for abuse of discretion . . . with substantial deference under Rule 403.") (citation omitted); United States v. Balter, 91 F.3d 427, 437 (3d Cir. 1996) ("Trial court rulings under Rule 404(b) are reviewed for an abuse of discretion and may be reversed only when they are `clearly contrary to reason and not

5

justified by the evidence.' ") (quoting United States v. Bethancourt, 65 F.3d 1074, 1079 (3d Cir. 1995) (citation omitted)). Where, however, the district court fails to explain its grounds for denying a Rule 403 objection and its reasons for doing so are not otherwise apparent from the record, there is no way to review its discretion. See United States v. Himelwright, 42 F.3d 777, 781 (3d Cir. 1994). In those circumstances, we need not defer to the district court's ruling, and we may undertake to examine the record and perform the required balancing ourselves. See id.; see also United States v. Sriyuth, 98 F.3d 739, 745 n.9 (3d Cir. 1996).

III. FACTS and PROCEEDINGS

A. Statement of Facts

We recite the germane facts from Becker's perspective as the verdict winner. See J&R Ice Cream, 31 F.3d at 1262. ARCO's predecessor, Sinclair-Koppers Company, hired Becker as a chemist in its Product Development Department in 1970. In 1980, Becker transferred to ARCO's headquarters in Newtown Square, Pennsylvania, where the company assigned him to work in the physical testing laboratory until his discharge in March 1994. The physical testing laboratory is a part of ARCO's Chemical Research Services Group, which in turn is part of ARCO's Research and Development Department ("RDD"). At the time of Becker's discharge in 1994, Andrew Goldsmith ("Goldsmith") was Manager of the Research Services Group, and James Victor ("Victor") was the Manager of the Chemical Analysis and Physical Testing Laboratories. Victor was Becker's immediate supervisor, and Goldsmith was Victor's immediate supervisor and Becker's "second-level supervisor." Goldsmith's predecessor in his position was Dr. Kermit Ramey ("Ramey"), who retired from ARCO in 1992.

The physical testing laboratory conducted routine strength and durability tests on various materials used in a variety of products. ARCO employed Becker as a"Senior Principal Scientist," and in that capacity, he supervised

three professionals, ten laboratory technicians and was responsible for testing thousands of samples. As the laboratory supervisor, Becker's responsibilities also included providing test results to ARCO's in-house

customers that had submitted the samples for testing. Becker's position additionally required him to submit reports to his superiors which detailed his laboratory activities during specific time periods. App. at 2849.4

In each year of his employment with ARCO, Becker received written performance evaluations, which he submitted for the jury's consideration. In each performance evaluation Becker's overall ratings from 1970 to 1993 were average, above average, and in some years, superior. Moreover, each year from 1970 to 1993, ARCO increased Becker's salary either by a merit increase or a bonus. Even in his last year of employment, ARCO awarded Becker a one percent bonus.

Becker testified at trial that in May 1985, Kermit Ramey, then the Manager of the Research Services Group, told him that he was going to have a new supervisor, James Victor. According to Becker, Ramey told him that Dr. James Connor ("Connor"), Vice President of the RDD,"want[ed] to have younger people in management, [and] therefore, Jim Victor is going to be your new boss." App. at 2835.

Becker also testified that in March 1987, Victor advised him during a telephone conversation about Becker's 1986 performance review that "he [had] to knock[him] down a notch." App. at 2838. According to Becker, Victor stated that he was taking Becker "off the fast track," because "younger people are complaining because you older guys are getting all the money allocated for the merit budget." App. at 2839. Becker testified at trial that he was left with the impression after his conversation with Victor that he (Becker) was one of those "old guys," and that he was "in a pretty bad spot" at that point. Id.

_____

4. Throughout this opinion, we cite the Joint Appendix as "App. at ___." Similarly we refer to the trial exhibits, which are bound and paginated separately, as "TE at ___." Also, we refer to the parties' briefs in the appeal from ARCO's post-trial motion as "Appellant ARCO's Br. at ___" and "Appellee Becker's Br. at ___."

Becker testified that in August 1990, he met with Ramey and Victor and discussed Linwood Seaver's work performance. According to Becker, Ramey asked Becker to confirm his (Ramey's) understanding concerning certain aspects of Seaver's work on the "Fibersorb project," a project that Becker had supervised. Becker testified at trial that Ramey asked him if he recalled that the project was a "disaster," with bad data and poor test results. Becker further testified that he told Ramey that he could not confirm Ramey's impression in that regard because it was completely contrary to his (Becker's) recollection of the results achieved on the project. Becker testified that Ramey said in response that "it doesn't make any difference anyhow, Seaver isn't coming back here regardless. He's fired and that's that." App. at 3232-33.

The record also reflects that in late 1991, ARCO offered certain employees an early retirement package. ARCO approached Becker with the offer, but he rejected it because he wanted to continue working for the company. App. at 2840; app. at 3255. Becker discussed the retirement package with Victor, and specifically addressed the reasons why he could not accept the offer. Becker explained that he "loved his job," "could not afford to retire," and that he planned on remaining at ARCO"for the duration." App. at 2842. According to Becker, Victor was "upset" at Becker's comments concerning his hopes of continued employment at ARCO, see id., and was "aloof and standoffish" towards him after that conversation. App. at 2843.

Testimony adduced at trial shows that in Becker's 1991 performance evaluation (completed in February 1992), Victor criticized Becker's handling of certain aspects of "the dylark test" that Becker performed during October 1991. App. at 2850-52. Becker described dylark as a "plastic material that can be molded into different shapes." Becker's principal responsibility in conducting the dylark test was to test the product's strength so that the material could be compared meaningfully to a competitor's similar plastic material. App. at 2843. Becker testified that he completed the tests in what he considered to be a timely manner, and reported their results to the customer. Nevertheless, Victor

criticized Becker's performance of the dylark test, stating that Becker's "personal credibility was damaged" because he failed to provide test data as promised and failed to

communicate fully the details of the testing to the customer. TE at 154.

After Victor refused to retract his negative comments in Becker's 1991 evaluation, Becker filed an Employee Problem Resolution ("EPR") appeal. ARCO designed the EPR process to assist employees with resolving employment performance issues without fear of reprisal. Apparently, ARCO did not resolve Becker's EPR appeal concerning his 1991 evaluation to his satisfaction. App. at 2856.

According to Becker, in July 1992, he found a note on his desk in the morning when he came to work. The note said "Congradulations [sic], short timer. ha ha." TE at 502. He took the note as meaning that he would not be employed at ARCO much longer. Becker did not know who put the note on his desk, but he had it notarized to prove that he received it that day.

In June 1993, Dr. Kenneth McDaniel ("McDaniel") and Dr. Andrew Thompson ("Thompson"), two of Becker's ARCO customers, expressed dissatisfaction with the timeliness of certain foam samples submitted to Becker's laboratory. App. at 3095-96. Apparently, McDaniel and Thompsonfirst mentioned the perceived problems to their supervisor, Dr. John Televantos ("Televantos"). App. at 3112. Televantos, in turn, orally communicated these complaints and his own dissatisfaction with the physical testing laboratory to Becker's second-level supervisor, Goldsmith. App. at 3095-98. Later, both McDaniel and Thompson wrote memoranda which memorialized their complaints and the basis for them. TE at 35-36. Specifically, both McDaniel and Thompson complained that the slow turnaround time in Becker's laboratory caused them to transfer the necessary testing work to ARCO's South Charleston, West Virginia, facility.

Sometime shortly after Goldsmith and Victor learned of the customers' complaints about Becker's laboratory, they consulted the Director of the Employee Assistance Program, David Sullivan, Ed. D. ("Sullivan"), and the Human

9

Resources Director, Ronald Shearer ("Shearer"), about the situation. Subsequently, Goldsmith and Victor told Becker that he was required to meet with Sullivan to discuss the basis for his performance problems. TE at 39. It appears from the record that McDaniel and Thompson wrote their memoranda to document their complaints around the same time frame that Goldsmith and Victor referred Becker for the evaluation. App. at 3132. Becker's supervisors, however, did not provide him with copies of the written

complaints prior to his first meeting with Sullivan. App. at 1115.

Becker met with Sullivan twice in July 1993. Sullivan's notes indicate that he believed that Becker was under stress related to work and the alleged customer complaints, but that he "exhibited no signs of dysfunction," and thus was "capable of carrying out his duties." TE at 525. In view of the customer complaints and his supervisors' referral for the psychological evaluation, Becker feared at this point that his position was in jeopardy. Becker clearly was distressed by the fact that his supervisors required him to consult with Sullivan.

In response to the McDaniel and Thompson memoranda, Becker submitted written "rebuttals" directed to his customers and supervisors. In those memoranda, Becker explained his position and characterized the customers' data and ultimate conclusions concerning his work as inaccurate and without merit. TE at 42-47; see also TE at 566-84. Becker wrote these rebuttals in January 1994, after he met with Sullivan.

Early on March 4, 1994, Victor, Goldsmith and Shearer met with Becker and informed him that he was terminated effective immediately. App. at 2865. Insofar as we can ascertain, ARCO took this step without prior warning. As might be expected, Becker, who had been employed by ARCO and its predecessors for about 24 years, was shocked by this treatment. In a letter dated March 4, 1994, Shearer confirmed Becker's dismissal, and referred to unresolved "performance issues" as its basis. TE at 637. ARCO's brief explains that Goldsmith and Victor decided in early 1994 to fire Becker because of Becker's (1) repeated problems with his customers; (2) continual refusal to

10

respond "constructively" to customer complaints; and (3) "apparent obsession with creating and distributing confrontational and often insulting rebuttal memoranda." Appellant ARCO's Br. at 15.

According to Becker's theory at the trial, his customers fabricated the alleged problems with his laboratory at his supervisors' direction. Thus, in Becker's view, the customers' complaints were "trumped up" so that ARCO could cite them as a legitimate basis for terminating his employment. See Appellee Becker's Br. at 10; app. at 3132; app. at 3274-76. Thus, the validity of the customer complaints which allegedly served as part of the justification for Becker's dismissal became a central issue in the case.

Robert Smith ("Smith"), a laboratory technician, replaced Becker almost immediately after Becker's termination. Smith was 43 years old at the time of his promotion to Becker's position. Becker had hired and trained Smith, and was primarily responsible for his performance reviews. Appellee Becker's Br. at 11; app. at 2876-77. According to Becker, Smith was a very accurate and good technician, but he lacked the level of Becker's technical expertise and knowledge. Moreover, Becker also had indicated in Smith's 1993 evaluation that he needed to develop further his interpersonal skills. Id. at 2877.

ARCO offered to make Becker a lump sum payment "equal to 24 weeks of [Becker's] base pay, minus applicable withholdings," contingent on his signing a separation agreement requiring him, inter alia, to waive any future age discrimination claim against ARCO. Thus, ARCO offered Becker one week's pay for every year he had worked for ARCO or its predecessor. ARCO also said that it would pay him "four weeks' pay" and pay him for 30 days of unused vacation time. These payments were not contingent on Becker signing the release. Becker refused to sign the waiver, and subsequently filed this suit.

B. Procedural History

Becker filed his complaint in the district court on November 15, 1995, alleging violations of the ADEA (count

1) and the PHRA (count 2), and asserting a state law claim for intentional infliction of emotional distress (count 3). The district court granted ARCO's motion for summary judgment on the intentional infliction of emotional distress claim by order entered July 1, 1997, but denied its motion as to the state and federal age discrimination claims. App. at 602-06. The remaining counts proceeded to a singular trial on liability and damages. On November 3, 1997, the jury found that ARCO violated the ADEA and the PHRA by terminating plaintiff 's employment, and awarded Becker $736,095.00 in damages.

Subsequently, the parties filed post-trial motions, the dispositions of which are the basis for these appeals. First, ARCO filed a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), or in the alternative for a new trial pursuant to Fed. R. Civ. P. 59(a), or in the alternative for a remittitur. The district court denied ARCO's motion in its entirety by memorandum opinion and order entered June 30, 1998. See Becker I, 15 F. Supp.2d at 600. Second, Becker petitioned the district court for an

award of $562,421.25 in attorney's fees and $36,613.95 in costs, and filed a separate motion to "mold" the verdict to include post-trial interest on the front pay award and pre-trial interest on the back pay award, and to reflect adverse tax consequences he suffered by reason of receiving his back pay and front pay award in a lump sum. By memorandum opinion and order entered July 23, 1998, the district court granted in part and denied in part Becker's petition for attorney's fees and costs, and his motion to mold the verdict. See Becker II, 15 F. Supp.2d at 621. Then on August 31, 1998, the district court entered an order denying plaintiff 's motion for reconsideration of the prior July 23, 1998 order in Becker II.

ARCO appeals from the district court's order in Becker I, and Becker cross-appeals from the district court's order in Becker II and its order denying reconsideration. Becker does not appeal from the summary judgment on the intentional infliction of emotional distress claim.

IV. DISCUSSION

ARCO contends that it is entitled to a new trial on the federal and state age discrimination claims based in part on

the district court's erroneous admission of certain evidence pertaining to the circumstances surrounding ARCO's discharge of Becker's co-employee, Linwood Seaver. ARCO contends that the court should have excluded the evidence pursuant to Rules 404(b), 403 and 608(b). Principally, it claims that there was not a proper basis under Rule 404(b) for admitting the "manner" in which ARCO terminated Seaver. Alternatively, it argues that assuming arguendo that Rule 404(b) permitted the evidence's admission, the district court should have excluded it under a balancing analysis pursuant to Rule 403.

As previously mentioned, the district court permitted Becker to testify that, in August 1990, in connection with ARCO's dismissal of Seaver, Ramey asked Becker to confirm Ramey's understanding regarding the outcome of the "Fibersorb project," a project on which Seaver had worked and Becker had supervised personally. Specifically, Ramey asked Becker to confirm Ramey's understanding that the project was unsuccessful, which in turn obviously reflected poorly on Seaver. Becker's testimony on this point, in its entirety, is as follows:

> Q. Now, I have another question about--taking you back in time, if I may, to the time period of 1990, around the time period of 1990, did there come a

time when you had a meeting with Dr. Ramey and Mr. Victor regarding another ARCO employee?

A. Yes.

Q. And can you tell the jury and his Honor about that briefly?

A. Yes, I was asked by Mr. Victor to come to Dr. Ramey's office. It was in the early afternoon of August the 15th. Mr. Victor was there with Dr. Ramey. Dr. Ramey handed me a letter that Mr. Seaver had written to Dr. Griffith, the vice president of research and development. Dr. Ramey said that he wanted me just to focus on the part of the letter that had to do with Fibersorb and that Dr. Ramey wanted--needed to respond back to Dr. Griffith in regards to the Seaver letter.

Dr. Ramey said that according to his recollection of the first meeting, there was some--it [ i.e., the project] was a total disaster with bad data presented and poor test results.

Q. And did you respond to that?

A. Yes, I did.

Q. And what was your response?

A. Well, I was totally shocked because we had presented extensive laboratory data which showed that that was totally opposite of what Dr. Ramey had told me--had said about the bad data presented and poor test results.

Q. What was your impression at that time?

A. Well, he was asking me if I had--if my recollections were the same as his. And of course, they weren't and I told him so.

Q. And what did you tell him?

A. I explained to him the entire circumstances of the meeting that Dr. Ramey was referring to and after I finished, Dr. Ramey said that it doesn't make any difference anyhow, Seaver isn't coming back here regardless. He's fired and that's that.

App. at 3232-33. As both parties recognize, the inference

that Becker drew from this alleged conversation was that Ramey and Victor wanted Becker to corroborate that Seaver performed poorly on the Fibersorb project, and thus, in essence, asked Becker to "lie" about the quality of Seaver's work. See app. at 674 (Def.'s Mem. in Supp. of Mot. for a New Trial); see also app. at 3238. Indeed, both Becker's testimony and his counsel's closing argument conveyed the message to the jury that it was Becker's impression that Ramey and Victor solicited his assistance in fabricating evidence of Seaver's poor performance on the project to facilitate Seaver's termination.[5]

_____

5. For example, during Becker's cross-examination, ARCO's counsel elicited Becker's interpretation of the significance of Ramey's comments

14

While the record on the point is somewhat confusing, we have studied it intensely and it appears to us that Becker's counsel first raised the specific subject of the "Seaver evidence" during Becker's testimony on redirect examination. When ARCO objected to this testimony, Becker's counsel argued that the evidence was admissible at that juncture to contradict ARCO's prior testimony to the effect that it retained older employees. App. at 2956 ("Your honor, they opened the door when they were proud to say these people stayed. . . . This goes to the credibility and the pretext issues that are paramount in this case."); app. at 2954 (by the court: "[T]here are two questions [pertaining to admissibility]: number one, whether this can be done on redirect. And I find I have a problem with that. But even assuming that this is proper redirect, the question would be whether you can introduce evidence of prior bad acts by the decision maker as a way of impeaching the decision maker's [credibility]."). At that time, the court excluded the testimony, holding as follows:

> THE COURT: I find that it is beyond the scop e of redirect. I also find that even if it is within the scope of redirect, under [the] 403 analysis, the evidence should not be allowed into the case.

_____

to him at the meeting on August 15, and what Ramey wanted Becker to do:

> Q. And your observations today, were that you were asked to lie, correct?
>
> A. Say that again?
>
> Q. Your observations today when you spoke earlier were that you

were asked to lie. It was your impression that you were asked to lie, correct?

A. At that time?

Q. Yes.

A. That's my feelings [sic], yes.

App. at 3238; see also app. at 3242–46; app. at 3268–69 (Becker's closing argument).

15

> On the one hand, . . . whatever probative value the evidence may have is substantially outweighed by the danger of unfair prejudice involving a different situation with a different employee, and the danger of confusion to the jury as to what the issues are in this particular case.
>
> So that evidence, I find will be excluded.

App. at 2958.

The next day, October 24, 1997, Becker filed a memorandum of law in support of his attempt to introduce the "manner" of Seaver's termination, arguing that it was relevant to establish ARCO's "intent" in terminating plaintiff and "plan" of fabricating reasons for terminating older employees under Rule 404(b). See app. at 607–11 ("Plaintiff 's Memorandum of Law in Support of Introducing the Manner of Terminating Older Employees."). We understand that this was the first point at which Becker offered the evidence under Rule 404(b).

On October 25, 1997, ARCO filed its opposition to Becker's memorandum, contending that Becker was offering his testimony concerning the "manner" in which ARCO allegedly terminated Seaver for an improper purpose under Rule 404(b). Specifically, it argued that Becker sought to establish from this evidence that, "because [ARCO] found it necessary to discharge another employee who was over 40, it must have been because of age discrimination, and therefore, because [ARCO] found it necessary to discharge plaintiff, it must also be because of age discrimination." App. at 615.

In response to Becker's memorandum, the court heard oral argument on October 27, 1997, and appears to have retreated from its prior position regarding the testimony's admissibility. Because it is crucial to our analysis to

understand the district court's rationale for admitting this evidence, we will highlight the relevant portions of the discussion between the court and counsel on this point:

>    THE COURT: [O]kay, it doesn't strike me that it [the Seaver evidence] has anything to do with the reasons why--why Mr. Seaver was terminated[.] [I]t has to do with modus operandi of Mr. Victor and Dr. Ramey.

16

>    . . . .

>    MS. MATOS [Becker's attorney]: It goes t o the state of mind and the way that they--

>    THE COURT: See, I think your motion kind . . . of asks for more than you need. I mean this doesn't seem to me [to have] anything to do [with] the reason why Seaver was terminated. That is not at issue.

>    The question is how--the point would be that if the jury believed the testimony, it would show that Mr. Victor and Dr. Ramey had previously created a pretext to get rid of an employee.

>    Now that doesn't mean that they didn't have cause to get rid of the employee, or that it was right or wrong. It wouldn't get us down that road. So, that's what I--I find your motion nothing out of the ordinary.

>    Lets hear from the defendant, what's the problem with this.

>    . . . .

>    MR. JOHNS [ARCO's attorney]: [Y]ou 're going to ask the question, plaintiff will get up and ask the question and leave this inference out there.

>    THE COURT: Well, the inference, there is no inference, I mean if you ask somebody to falsify testimony, [t]hat's pretty clear. That has nothing to do with it. That is--that would go to whether or not the decision maker had previously created--it goes to credibility, whether or not he had previously had trumped up charges. I mean that's basically what it is.

>    . . . .

>    MR. JOHNS: Again, your Honor, the plaintiff is confusing the decision maker in that case, which is Kermit Ramey, with the decision makers in this case

which are Andrew Goldsmith and Jim Victor. And as well, your honor, I believe that this is basically just a spin on . . . what actually was testified to at Mr. Becker's deposition.

He testified at length about these circumstances and never once said that anyone asked him to fabricate or lie about this.

THE COURT: Well, I think that's proper cross-examination, he may have a problem explaining that . . . because that would seem to be pretty important.

MR. JOHNS: That's correct, your Honor, but I thought your ruling now was that they could only ask Mr. Victor and no[t] re-open--

THE COURT: No, they will ask Mr. Victor. Mr. V ictor may say yes, it all happened. If Mr. Victor denies it, then in rebuttal then they can, they can put on a witness that would address that issue.

MR. JOHNS: . . . . And plaintiff 's allegat ions relating to Mr. Victor are solely that Mr. Victor may have been present at this meeting. Even the plaintiff does not get up and say that Mr. Victor asked him to fabricate evidence. And Mr. Victor is the decisionmaker here, not Dr. Ramey. And therefore, your Honor, we believe that this is totally prejudicial at this late stage of the game.

THE COURT: Well, let's take it one step at a t ime. We'll see what Mr. Victor says.

App. at 3063–67.

Quite predictably, Becker's counsel questioned Victor concerning the events that allegedly transpired, but he denied ever having been present in a meeting in which Ramey asked Becker to recollect Seaver's performance in a manner that was contrary to Becker's actual impressions. Subsequently, Becker's counsel outlined the substance of the proposed rebuttal testimony, and the court again addressed the admissibility of the Seaver evidence. At that juncture, the district court considered again whether Becker could testify, consistently with Rule 404(b), about his recollection of the meeting in which Seaver and the Fibersorb project were discussed. The colloquy during this later discussion reveals the district court's theory of admissibility under Rule 404(b) for this evidence:

THE COURT: . . . It's not being offered to say  that

Mr. Victor is a bad person because he had–he had done

this in the past. It's being offered to show a pattern, or habit. A pattern or habit can only be shown by indicating what the person has done in the past.

Now, if they were going to show that he had--you know, he was nasty to his neighbor, that's something else.

MR. JOHNS: That's correct, your Honor, but one instance in 1990 in which Mr. Victor sat in and listened to Dr. Ramey does not establish a pattern or habit. And under the rule, I think clearly the case law is clear on that, that this should be excluded on that basis.

. . . .

THE COURT: What you're saying is that you can' t have a habit out of one act?

MR. JOHNS: That's right, your Honor.

. . . .

MS. MATOS: [in response] I don't think w e referred to that rule, we referred to Rule 404(b). And actually we are under Rule 404(b) . . . .

And under that rule, even in criminal cases, if a criminal commits a crime in the past, even if he's not convicted[,] that can be used.

THE COURT: Well, I mean it seems to me that in  this case the event is nearly identical and as such it would be probative of plan, knowledge, intent and preparation.

I would agree with you if it had to do with some other conduct that is not probative, but we have allegedly the same case.

. . . .

Now, I'm not telling you that its true. The jury may not believe it at all, may think its ridiculous, but I can't --I don't think there will be any stronger evidence. . . . Now, that's entirely up to the folks in the jury to believe it, but I think they ought to hear it.

. . . .

> [T]he point here is that you had an employee, and
> the employee, there was a request, according to the
> plaintiff, that he falsif[y] evidence. What difference does
> it make if he's 80 years old, if he's 21 years old. The
> point is that his testimony is that exactly what is
> happening in this case, I was asked to do it before, that
> goes to motive, intent and practice. . . .

App. at 3225-30 (emphasis added). As these passages
show, the court admitted the evidence under Rule 404(b),
but did not perform a Rule 403 analysis on the record at
that time.[6]

The court, however, later did provide a limiting
instruction to the jury in its charge, stating the purposes
for which the Seaver evidence could be considered. But the
court's jury instruction on this point was rather cursory,
and we cannot understand how the jury could have derived
much meaning from it:

> Now you've also heard evidence of Mr.––Dr. Ramey
> made comments to Mr. Becker in the presence of Mr.
> Victor, concerning the termination of another ARCO
> Chemical employee. Those statements were not
> admitted into evidence to prove the character of Dr.
> Ramey or Mr. Victor in order to show that they
> performed similar acts when terminating Mr. Becker's
> employment. You may only consider that evidence as
> proof of motive, intent, preparation, plan or knowledge.

App. at 3298 (emphasis added).

We must determine whether the district court abused its
discretion in admitting this evidence under Rule 404(b),
and if not, whether the balancing test of Rule 403
nonetheless compels the conclusion that the court erred in
admitting the testimony. We begin with the concept of
relevancy. Rule 401 defines relevant evidence as"evidence
having any tendency to make the existence of any fact that

_____

6. While the district court did not make an analysis under Rule 403 at
the time that it ruled that the Seaver evidence was admissible, it
provided its rationale for admitting the evidence under Rule 403 in its
memorandum opinion denying ARCO's post-trial motion. See Becker I,
15 F. Supp.2d at 613-15.

is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevant evidence is admissible unless the rules of evidence or other controlling constitutional provisions, statutes or rules provide otherwise. See Fed. R. Evid. 402; Sriyuth, 98 F.3d at 745.

Rule 404(b) is one of the rules limiting the admissibility of otherwise relevant evidence. See Sriyuth, 98 F.3d at 745; see also United States v. Scarfo, 850 F.2d 1015, 1019 (3d Cir. 1988) (citing Huddleston v. United States , 485 U.S. 681, 687, 108 S.Ct. 1496, 1500 (1988)). In Sriyuth, we reiterated the long-standing principle that Rule 404(b) precludes the admission of evidence of other crimes, wrongs or acts to prove a person's character. Sriyuth, 98 F.3d at 745; see also United States v. Johnson , 199 F.3d 123, 128 (3d Cir. 1999) (permitting admission of evidence of prior robbery to show defendant's "common plan" in prosecution under 18 U.S.C. S 1951 for conspiracy to interfere with interstate commerce by robbery, and noting that we favor admission of Rule 404(b) evidence"if relevant for any other purpose than to show a mere propensity or disposition on the part of the defendant to commit the crime") (internal quotation marks omitted); Scarfo, 850 F.2d at 1019 ("We have said that we will refuse to admit evidence of prior criminal acts which has no purpose except to infer a propensity or disposition to commit crime.") (internal quotation marks omitted). Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

We have adopted a four-prong test to determine the admissibility of Rule 404(b) evidence:

> `(1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the [district] court must

21

> charge the jury to consider the evidence only for the limited purpose for which it was admitted.'

See J&R Ice Cream, 31 F.3d at 1268 (quoting United States v. Console, 13 F.3d 641, 659 (3d Cir. 1993) (quoting United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992))); see

also Himelwright, 42 F.3d at 781 (stating that for "other crimes" evidence to be admitted, it must be relevant logically, under Rules 404(b) and 402, to any issue other than the defendant's propensity to commit the act in issue, and its probative value must outweigh its prejudicial effect).

In denying ARCO's motion for a new trial, the district court found Becker's testimony admissible under Rule 404(b) because it was evidence of a "scheme or plan of fabricating reasons used by the decisionmaker in terminating employees." Becker I, 15 F. Supp.2d at 614. The district court also reasoned that "evidence of an instance in which a pretext was fabricated in connection with the termination of another employee, could also be relevant to the issue of whether Mr. Victor, the decision maker in this case, acted with discriminatory intent." Id. Reading these passages in conjunction with the court's statements on the record during the trial, we understand that the district court predicated its admissibility ruling on its conclusion that the Seaver evidence showed the plan, pattern or practice ARCO utilized in terminating its employees, which in turn was relevant to determining a specific disputed fact in the case--whether ARCO provided pretextual reasons to support Becker's dismissal. This specific disputed fact, in turn, was relevant to an ultimate fact in dispute--whether ARCO intentionally discriminated against Becker because of his age. Hence, the proffered purpose for introducing evidence tending to establish ARCO's plan in terminating employees was so that the jury could infer that ARCO had a discriminatory intent in discharging Becker from the way it allegedly terminated Seaver. On appeal, Becker repeats this theory of admissibility. See Appellee Becker's Br. at 40.

ARCO contends that the district court's ruling in this regard is erroneous for two reasons. First, it asserts that the Seaver evidence could not be admitted to establish Victor's or Goldsmith's "scheme" or "plan" because neither

had asked Becker to recall any aspects of Seaver's performance on the Fibersorb project. As ARCO correctly points out, even according to Becker's version of the events that took place at the August 1990 meeting, Ramey--not Victor--asked Becker to substantiate Ramey's recollection concerning the disastrous results on the Fibersorb project. Appellant ARCO's Br. at 39. Second, ARCO contends that the event at issue, i.e., the meeting at which Ramey allegedly asked Becker to corroborate a fabricated performance deficiency, was too remote in time from Becker's eventual discharge to constitute evidence establishing ARCO's common scheme or plan. Thus,

ARCO's contentions clearly implicate the first inquiry under the four-part analysis we described in J&R Ice Cream, namely, whether the testimony is admissible for a proper purpose under Rule 404(b). Given the two theories of admissibility proffered here, we must consider whether the Seaver evidence is admissible either to establish ARCO's intent or "scheme or plan."[7] See Becker I, 15 F. Supp.2d at 614.

_____

7. We point out that Becker has not argued that the Seaver evidence was admissible for any other purpose other than establishing ARCO's intent and common scheme or plan, despite the fact that the district court, in a somewhat conclusory fashion, cited other purposes listed in Rule 404(b) which it believed supported the admission of this evidence under the rule. For example, in its ruling on the record, the district court stated that, in addition to establishing ARCO's"intent" and/or "scheme or plan," the Seaver evidence was probative of, inter alia, ARCO's "knowledge," "motive" and "preparation." App. at 3228, 3230. Even if Becker had contended before us that these additional exceptions provided a legitimate basis for admitting the Seaver evidence under Rule 404(b), we summarily would have rejected that argument. First, it cannot be argued plausibly that evidence of ARCO's alleged fabrication of Seaver's poor performance could establish ARCO's"preparation" or "motive" in connection with Becker's termination. Compare Balter, 91 F.3d at 437 (holding that district court properly admitted Rule 404(b) evidence that defendant in murder-for-hire criminal trial boasted about his prior experience as a murderer for hire under the theory that it established the defendant's motive and preparation; the witness testified that the defendant stated that he "had done this type of thing before . . .

that he had not been doing it, but would do it because he needed the money," and "that he knew what he had to do, he had done it before and he knew what he had to do to kill [the victim].") (internal quotation

23

First, we will consider Becker's contention that the Seaver evidence is admissible for purposes of establishing ARCO's intent to discriminate against Becker. While Becker's brief does not articulate clearly how this evidence tends to establish ARCO's intent to discriminate against Becker, it appears that Becker hoped, through this evidence, to demonstrate that ARCO terminated him in a similar manner, i.e., by fabricating performance problems to justify its predetermined decision to fire him. See Appellee Becker's Br. at 40. Becker contends, therefore, that the evidence was relevant logically to a disputed issue and admitted for a proper purpose under Rule 404(b)--to establish the discriminator's intent. In support of this argument, Becker asserts that similar evidence of past discriminatory treatment of other employees has been

admitted in employment discrimination suits for that same purpose.

To be sure, our precedents teach that in an employment discrimination case in which the employee's proof of intentional discrimination is comprised of circumstantial evidence, the trier of fact may infer an employer's discriminatory intent where the plaintiff 's evidence renders the employer's asserted nondiscriminatory reasons for the plaintiff 's discharge weak, implausible, inconsistent or contradictory. See Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); see also Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1067 (3d Cir. 1996) (en banc). Arguably, the Seaver evidence rendered ARCO's purported nondiscriminatory reasons weak or implausible, because it made it more likely that Becker performed satisfactorily and that ARCO fabricated reasons in order to facilitate his lawful termination. It is in this sense, then, that the Seaver evidence arguably is relevant logically to the issue of ARCO's discriminatory intent towards Becker.

_____

marks omitted); see also Sriyuth, 98 F.3d at 747. Moreover, we fail to see how this evidence could be admitted under the theory that it was relevant to show ARCO's knowledge in terminating Becker. Obviously, there was no issue in this case about ARCO's knowledge of the circumstances surrounding Becker's dismissal. Thus, we will confine our analysis in the text to the two primary theories proffered in support of admissibility--intent and scheme or plan.

24

Nevertheless, while Becker may have demonstrated that the evidence is relevant logically to the issue of ARCO's intent, the inquiry under Rule 404(b) requires a more searching analysis which also focuses on the chain of inferences supporting the proffered theory of logical

relevance. In Morley, we recently reiterated the self-evident proposition that "a proponent's incantation of the proper uses of [Rule 404(b) evidence] . . . does not magically transform inadmissible evidence into admissible evidence." Morley, 199 F.3d at 133. Indeed, when a proponent of Rule 404(b) evidence contends that it is both relevant and admissible for a proper purpose, "the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged." See id. (internal quotation marks omitted); Himelwright, 42 F.3d at 782 (citing United States v. Jemal, 26 F.3d 1267, 1272 (3d Cir. 1994)); Government of the Virgin Islands v. Pinney, 967 F.2d 912, 915 (3d Cir. 1992) ("In order . . . to admit evidence under Rule 404(b), a court

must be able to articulate a way in which the tendered evidence logically tends to establish or refute a material fact in issue, and that chain of logic must include no link involving an inference that a bad person is disposed to do bad acts.").

The Seaver evidence fails this test because the logical connection between ARCO's alleged "fabrication" of performance problems in relation to Seaver's dismissal and its purported conduct in terminating Becker is the inference that ARCO was likely to have fabricated customer complaints and other performance problems in Becker's case merely because ARCO previously engaged in a similar impropriety in facilitating Seaver's dismissal. The problem is, as we recognized in Morley, "this is the very evil that Rule 404(b) seeks to prevent." See Morley, 199 F.3d at 134. Put another way, the evidence of ARCO's "manner" of terminating Seaver simply is not relevant on the issue of whether ARCO discriminated against Becker absent the inference that ARCO had a propensity to act in a certain way, and that in firing Becker, it acted in conformity with its prior conduct. Compare Pinney, 967 F.2d at 917 ("In this case . . . there is no chain of logical inferences between a

25

rape of Jamilla by [the defendant] and [the victim's credibility, which was the proffered purpose for admitting the evidence under Rule 404(b)], which does not involve an inference that if Pinney raped Jamilla he is likely to have raped [the victim] as well."); see also Government of the Virgin Islands v. Archibald, 987 F.2d 180, 187 (3d Cir. 1993) (finding that evidence that defendant had sexual intercourse with ten year-old victim's sister who was 13 or 14 years old at the time was inadmissible under Rule 404(b); court held that the evidence "suggested to the jury that [defendant] had a propensity to engage in intercourse with minor females, and that he had a particular affinity for underage daughters of Ursula Williams"). Accordingly, because Becker has failed to articulate how the Seaver evidence fits into a chain of logical inferences pointing towards ARCO's intent without involving the inference that because ARCO committed the first act it was more likely to have committed the second, see Pinney, 967 F.2d at 916, we cannot agree with the district court's conclusion that the evidence was admissible under Rule 404(b) to establish ARCO's intent to discriminate against Becker.

Our recent opinion in Morley supports our conclusion in this regard. See 199 F.3d at 129. There the government charged the defendant, Morley, with conspiracy, mail fraud, bank fraud and wire fraud in connection with his conduct in allegedly attesting to a signature on a forged will. The

government's theory of the case was that Holmes, Morley's business associate, had an agreement with the decedent's two sons whereby he would draft a "fake will" that would make it seem that the decedent left the two sons with the entirety of his estate. Pursuant to the parties' agreement, however, Holmes and the two sons each would receive 1/3 of the estate, and according to the government, Holmes was supposed to split his 1/3 share with Morley. Morley's role in offense was that he attested to the signature on the fake will. Morley's defense was that while he admitted that he attested to the will outside the testator's presence, he did not know that Holmes forged the testator's signature. See id. at 131–32.

Over Morley's objection, the government introduced evidence which established that 14 months prior to his

arrest, he asked his parents to notarize 100 savings bonds purportedly signed by their rightful owner. As it turned out, Holmes apparently also had forged the signatures on the bonds. At trial, however, the government did not introduce any evidence to establish that Morley knew of the forgery. Nevertheless, Morley did not deny that he asked his parents to notarize the bonds, and it was undisputed that his parents eventually complied with his request. See id. at 132.

The government argued that this evidence was relevant to establish Morley's "knowledge, intent, plan, and modus operandi of falsely witnessing the will of a dead man who was neither known nor present." Id. After the jury convicted Morley on all counts, he appealed, contending that the district court erroneously admitted the evidence showing that he asked his parents to notarize the forged bonds.

We vacated Morley's conviction and remanded for a new trial. In particular, we found that the evidence of his prior conduct in asking his parents to notarize the savings bonds was not admissible under Rule 404(b) to establish his knowledge and intent in attesting to a forged signature on the will. We explained our reasoning in part as follows:

> [T]he government asserts that the challenged evidence was relevant to Morley's knowledge and intent at the time Holmes [the business associate] asked him to sign the will as a `third witness.' . . . This refrain is repeated throughout the government's brief. Yet, upon close examination, the only connection between Morley's request to his parents to notarize the bond, and his alleged attestation on the forged will is the inference that Morley was likely to have been guilty of the latter

merely because he had previously engaged in a `similar'
impropriety. This is the very evil that Rule 404(b) seeks
to prevent. Evidence pertaining to the notarized bonds
is simply not relevant to whether Morley knew the
signature on the [alleged testator's] will was forged
absent the natural (and improper) inference that lurks
beneath the surface of the government's use of this
evidence. At trial, the prosecution did not even attempt
to establish that Morley knew the signature on the
bonds was forged.

27

Id. at 133–34 (footnote omitted). We further clarified that
last statement in a footnote:

We do not mean to suggest that the evidence would
necessarily have been proper if the government had
shown that Morley knew the signature on the bonds
was a forgery. We do, suggest, however, that the
government's failure to establish that guilty knowledge
further undermines the government's assertion that
the prior conduct was relevant to Morley's intent in
attesting to the forged signature on the fake will.

Id. at 134 n.8.

We determined that the chain of logical inferences the
government offered in support of the admission of the Rule
404(b) evidence in Morley was tainted by an impermissible
inference concerning the defendant's character and his
propensity to commit the charged crime. See id.  at 137.
Indeed, it was obvious to us that the only reason that
Morley's request to his parents to notarize the forged bonds
was relevant to the issue of his intent and knowledge with
respect to his attestation of the fake will was because that
prior conduct was similar in nature to the charged offense
and showed that he had certain "propensities," which in
turn made it more likely that Morley knew the will was fake
when he signed it. We observed that the best explanation of
why the government offered the evidence was so that the
jury could infer from it that Morley "was the kind of guy
who had done it before, [and therefore was] the kind of guy
who will do it again." Id. at 134.

Here, too, the chain of logical inferences supporting the
admission of the Seaver evidence to show ARCO's intent
involves a link predicated on the suggestion that in
terminating Becker, ARCO engaged in a "similar
impropriety" as that which allegedly had occurred in
connection with Seaver's dismissal. Specifically, the initial
factual proposition, i.e., that ARCO fabricated Seaver's poor
performance, and the ultimate conclusion, i.e. , that ARCO

discriminated against Becker, are linked by the inference
that if ARCO fabricated Seaver's poor performance on the
Fibersorb project to facilitate his dismissal, it is more likely
that ARCO fabricated the customer complaints about

Becker to achieve the same result. From that premise the
jury could have inferred that ARCO intentionally
discriminated against Becker, inasmuch as the Seaver
evidence would have demonstrated that ARCO's proffered
legitimate nondiscriminatory reasons for Becker's
termination were weak, implausible and/or contradictory.
See Fuentes, 32 F.3d at 764.

We point out in this regard that Becker's most
comprehensive explanation of what he considered to be the
logical relevance of the Seaver evidence to the issue of
ARCO's intent occurred during the court's colloquy with
counsel on this point, but that the counsel's proffered
justification for admitting the evidence amounted to little
more than a "mantra-like recitation of the provisions of
Rule 404(b)." Morley, 199 F.3d at 137; see app. at 3227
("[A]ctually we were under 404(b), `It may however be
admissible for other purposes such as motive, opportunity,
intent, preparation, plan, knowledge, identity, or absence of
mistake or accident.' ") (quoting Fed. R. Evid. 404(b)).
Merely citing the relevant Rule of Evidence, however, is of
little assistance to either the trial or appellate court in
determining the difficult issue presented when confronted
with a proffer of Rule 404(b) evidence, and it falls woefully
short of the proponent's obligation when offering such
evidence purportedly for a non-character purpose. See
Morley, 199 F.3d at 137.

We also find it significant that in this appeal Becker has
failed to present an alternative chain of inferences by which
the Seaver evidence logically could be connected to the
issue of ARCO's intent, with no link predicated on an
inference concerning ARCO's propensity to act in a certain
way. Of course, this is not surprising given the record
presented here and Becker's theory of the case. Compare
United States v. Dise, 763 F.2d 586, 592-93 (3d Cir. 1985)
(defendant's prior similar incidents of misconduct were
relevant to establish his intent to injure inmates where
defendant contended that he acted only to maintain safety
or to prevent harm). Indeed, our review of the record
confirms that Becker grounded his case against ARCO
largely on his assertion that the customer complaints and
alleged performance problems were pretextual. Yet only if

the jury were to draw the inference that in terminating Becker, ARCO must have fabricated his alleged performance deficiencies, would the Seaver evidence have established circumstantially ARCO's intent to discriminate against Becker. As we observed in Morley, this sort of character-based inference "is the very evil that Rule 404(b) seeks to prevent." Morley, 199 F.3d at 134. Therefore, we hold that the district court erred in admitting the Seaver evidence based on its conclusion that it could be introduced for the non-character purpose of establishing ARCO's intent to discriminate against Becker.8 See Pinney, 967 F.2d at 916.

_____

8. We have not overlooked numerous cases which have held that, as a general rule, evidence of a defendant's prior discriminatory treatment of a plaintiff or other employees is relevant and admissible under the Federal Rules of Evidence to establish whether a defendant's employment action against an employee was motivated by invidious discrimination. See, e.g., United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 713 n.2, 103 S.Ct. 1478, 1481 n.2 (1983) (stating that evidence of an employer's comments were admissible to prove race discrimination); Robinson v. Runyon, 149 F.3d 507, 512-13 (6th Cir. 1998) (noting that evidence of a racially hostile atmosphere was admissible in Title VII suit to illustrate decisionmaker's attitude); Heyne

v. Caruso, 69 F.3d 1475, 1480 (9th Cir. 1995) (same, in sexual harassment suit under Title VII); Brown v. Trustees of Boston Univ., 891 F.2d 337, 349-50 (1st Cir. 1989) (permitting evidence of remarks made by president of the University concerning another woman on theory that the remarks could be construed as demonstrating sexist attitude); Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1102-04 (8th Cir. 1988) (noting that "circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices"); Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1423-24 (7th Cir. 1986) (upholding district court's admission of evidence of harassment of other workers to show that employer condoned racial harassment); see also Abrams v. Lightolier, Inc., 50 F.3d 1204, 1214 (3d Cir. 1995) (age-related comments and evidence of how supervisor treated older employees was probative of whether supervisor harbored discriminatory attitude against older workers); Glass, 34 F.3d at 194-95 (evidence of prior racial harassment was relevant to whether plaintiff was terminated because of age and/or race discrimination). In those cases, the courts admitted the evidence because of the discriminatory nature of the prior conduct, which in turn tended to show the employer's state of mind or attitude towards members of the protected class. Thus, in those circumstances, the inference of the employer's discriminatory attitude came from the

Becker next contends that the Seaver evidence is

admissible under the alternative theory that it circumstantially established ARCO's "plan," which is a

_____

nature of the prior acts themselves, and the prior acts of discrimination were not offered for the purpose of establishing the fact that the employer engaged in any particular act or course of conduct in connection with the plaintiff 's termination. Compare Heyne, 69 F.3d at 1480 (in Title VII quid pro quo action where plaintiff claimed that her employer came to her mobile home after work and propositioned her for sex and employer denied propositioning plaintiff, court of appeals held that plaintiff was entitled to introduce evidence of employer's treatment of other female employees, as it was probative of whether he terminated her because she rebuked his advances; nevertheless it stated specifically that "[the employer's] alleged harassment of other female employees cannot be used to prove that [the employer] propositioned [plaintiff] on the night before she was fired.") (citing Fed. R. Evid. 404(b)).

But it is clear from the limited nature of the Seaver evidence that the district court did not admit it based on the theory that it tended to establish, by its very nature, ARCO's discriminatory attitude towards its older employees. Compare Abrams, 50 F.3d at 1214–15. Rather, the district court admitted the testimony based on the theory that ARCO trumped up charges against any employee it wanted to discharge, not just the older ones, and the evidence was admitted for the specific purpose of establishing that ARCO fabricated performance problems in Becker's case. This distinction is confirmed by the fact that the jury did not hear any evidence pertaining to Seaver's age. The district court ruled that Becker could not testify on that point because it was hearsay and irrelevant, given the purpose for which the evidence was admitted. App. at 3230 (district court stating "[w]hat difference does it make if he's [Seaver] 80 years old, or if he's 21 years old? The point is that his testimony is that exactly what is happening in this case, I was asked to do it before, [and] that goes to motive, intent and practice.").

Thus, the rather circumscribed nature of Becker's testimony concerning the "manner" in which ARCO terminated Seaver distinguishes this evidence from the type of Rule 404(b) evidence generally admitted in employment discrimination trials for the purpose of establishing the employer's overall discriminatory attitude towards members of a protected class. Here the Seaver evidence, standing alone, does not suggest that ARCO possessed a discriminatory attitude towards its older workforce, and thus it was probative of the issue of ARCO's intent to discriminate only if the jury were to conclude that in firing Becker, it acted in the same way that it did when it discharged Seaver.

specific non–character purpose listed in Rule 404(b). Becker argues that the district court properly admitted the evidence to establish, under Rule 404(b), ARCO's plan, scheme, "practice," "modus operandi" or "pattern" of fabricating reasons for terminating unwanted employees.

See app. at 3230.

This assertion does little to answer the question of whether the evidence is admissible pursuant to that exception, however, as we have recognized that where proof of "a plan or design is not an element of the offense[,] . . . evidence that shows a plan must be relevant to some ultimate issue in the case." See J&R Ice Cream, 31 F.3d at 1269 (internal quotation marks omitted). Therefore, in order to determine if the Seaver evidence properly was admitted to show ARCO's "scheme or plan," which the district court described alternatively as ARCO's "pattern,""practice," and "modus operandi," we must pinpoint the evidential fact that Becker sought to prove from his testimony in that regard. From that initial inquiry, we must determine if the evidence, in the form that it was admitted at trial, satisfied the criteria necessary for admitting Rule 404(b) evidence on the theory that it establishes circumstantially ARCO's plan or scheme.

As to the initial question, i.e., the evidential fact that Becker sought to establish in admitting the testimony, Becker contends that the evidence was admitted to prove ARCO's intent. Given our discussion above, this argument obviously is unavailing. To reiterate, the Seaver evidence cannot be admitted based on the theory that it was relevant to prove the ultimate disputed issue in the case, given the circumstance that the evidence would establish ARCO's intent to discriminate against Becker only if the jury drew the inference that in terminating him, ARCO acted in conformity with its purported prior conduct in terminating Seaver.

As we have indicated, notwithstanding Becker's contrary arguments, the Seaver evidence could be material only to establish circumstantially that ARCO fabricated the performance deficiencies and customer complaints that allegedly formed the basis for Becker's termination. The question, then, is whether and in what circumstances

evidence concerning a defendant's prior conduct is admissible under Rule 404(b) as proof of the defendant's plan, where the evidence is admitted for the specific purpose of establishing that the defendant committed a subsequent act that is disputed in the case.

Commentators indicate that evidence tending to establish a defendant's plan or scheme under Rule 404(b) may be admitted for the purpose of proving the defendant's commission of the subsequent act itself where that issue is disputed. See, e.g., 1 John William Strong, ed., McCormick

on Evidence S 190, at 800-01 (4th ed. 1992) ("McCormick") ("Each crime should be an integral part of an over-arching plan explicitly conceived and executed by the defendant or his confederates. This will be relevant as showing motive, and hence the doing of the criminal act, the identity of the actor, or his intention.") (emphasis added) (footnote omitted); see also II Wigmore, Evidence S 300, at 238 (Chadbourne rev. 1979) (discussing distinction between proving intent through similarity of prior act and act in issue and proving the commission of the subsequent act itself by virtue of evidential theory that the two acts are part of a singular plan or design, and explaining that "[d]esign or plan, . . . is not a part of the issue, . . . but is the preceding mental condition which evidentially points forward to the doing of the act designed or planned.. . . In proving design, the act is still undetermined , and the proof is of a working plan, operating towards the future with such force as to render probable both the act and the accompanying state of mind.") (emphasis added); II Wigmore, supra S 304, at 249 ("When the very doing of the act charged is still to be proved, one of the evidential facts receivable is the person's design or plan to do it."). Nevertheless, for the reasons that follow, we hold that the district court erred in admitting the Seaver evidence on its theory that it established circumstantially the existence of ARCO's plan or scheme in terminating its employees.

In J&R Ice Cream we explained the general theory behind admitting proof of a defendant's prior act to establish his "plan," which in turn demonstrates the defendant's commission of the subsequent act in issue:

33

> Ordinarily, when courts speak of `common plan or scheme,' they are referring to a situation in which the charged and the uncharged [acts] are parts of a single series of events. In this context, evidence that the defendant was involved in the uncharged [act] may tend to show a motive for the charged [act] and hence establish the commission of the . . . [act], the identity of the actor, or his intention.

See id. at 1268-69 (internal quotation marks omitted) (quoting Pinney, 967 F.2d at 916) (alterations in original); see also 22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure S 5244, at 499-500 (West 1978) ("The justification for admitting evidence of other crimes to prove a plan is that this involves no inference as to the defendant's character; instead, his conduct is said to be caused by his conscious commitment to a course of conduct of which the charged crime is only a part."); see, e.g., Console, 13 F.3d at 659; United States v.

Levy, 865 F.2d 551, 558 (3d Cir. 1989).

Another commentator has explained the conceptual basis for admitting Rule 404(b) evidence to prove the existence of a "plan" slightly differently: "In a true plan case, the courts hold that the prosecutor may prove any uncharged crime by the defendant which shows that the defendant in fact and in mind formed a plan including the [prior act] and the [ ]charged [act] as stages in the plan's execution." See 1 Edward J. Imwinkelried, Uncharged Misconduct Evidence S 3:22, at 117 (West 1999) ("Imwinkelried I"); see also 1 Christopher B. Mueller, Laird C. Kirkpatrick, Federal Evidence S 113, at 667 (2d ed. 1994) ("What is crucial in this setting is that the other acts . . . , considered in light of the circumstances, support an inference that the defendants . . . formed a plan or scheme that contemplated commission of the charged crime. . . . `[S]urrounding circumstances must support an inference that the crimes were related in the defendant's mind,' and both the other acts and the charged crime `must be part of a common or continuing scheme.' ") (quoting Imwinkelried I) (footnotes omitted); 22 Wright & Graham, supra S 5244, at 499-500 ("The justification for admitting evidence of other crimes to prove a plan is that this involves no inference as to the

34

defendant's character; instead his conduct is said to be caused by his conscious commitment to a course of conduct of which the charged crime is only a part. The other crime is admitted to show this larger goal rather than the defendant's propensity to commit crimes.") (footnote omitted) (emphasis added). Imwinkelried's treatise thus explains the concept of a "true plan" in the context of criminal cases:

> Both crimes must be part of a common or continuing scheme; the plan must encompass or include both crimes; the crimes must be connected, mutually dependent, and interlocking. All these variations express the same core thought that both crimes must be inspired by the same impulse or purpose. Both crimes must be steps toward the accomplishment of the same final goal. They are different stages of the plan. It is not enough for the prosecution to show that the defendant had a plan including crimes similar to the charged crime; the prosecution must show that the plan included the specific crime the defendant is now charged with.

Imwinkelried I, supra S 3:22, at 119 (footnotes omitted). In this instance, the logical relevance of the prior act to the fact in issue, i.e., ARCO's commission of the subsequent

act, is that it shares with the subsequent act a similar purpose or motivation--a common goal. See 22 Wright & Graham, supra S 5244, at 500; id.  S 5244, at 483 (West Supp. 1999) ("To be properly admissible under Rule 404(b) it is not enough to show that each crime was `planned' in the same way; rather, there must be some overall scheme of which each of the crimes is but a part.").

The Seaver evidence is not admissible as proof of ARCO's "plan" based on these principles, inasmuch as there was no evidence presented that the two terminations were connected, mutually dependent, or part of any larger goal of ARCO's. See Imwinkelried I, supraS 3:22, at 119; 1 Mueller & Kirkpatrick, supra S 113, at 667; 22 Wright & Graham, supra S 5244, at 483 (West Supp. 1999). The district court did not admit the Seaver evidence on the theory that the two terminations were part of ARCO's large-scale plan to eliminate its older employees and create a younger

35

workforce. To the contrary, the district court's comments clearly demonstrate that it rejected the proposition that the Seaver evidence could be used to suggest that conclusion to the jury. Moreover, it is rather obvious that the two terminations are unrelated in the sense that one had nothing to do with the other, except for the fact that, allegedly, ARCO facilitated both by fabricating legitimate reasons to support the adverse employment actions. Finally, the fact that the two incidents were over three years apart, while not conclusive, certainly undercuts the possibility that the two events were examples of any"plan" on ARCO's part.

Instead, the record shows that the district court admitted the evidence based on the theory that it tended to show ARCO's "pattern," "practice" or "modus operandi" of fabricating legitimate reasons for terminating its employees when it wanted to eliminate them from its workforce. See App. at 3063, 3225, 3230. In J&R Ice Cream we explained that "a common plan or scheme may consist of incidents [that] were sufficiently similar to earmark them as the handiwork of the same actor, and thus constitute signature evidence of identity." See J&R Ice Cream, 31 F.3d at 1269 (internal quotation marks omitted) (alteration in original) (quoting Pinney, 967 F.2d at 916); see also United States v. Echeverri, 854 F.2d 638, 645-46 (3d Cir. 1988); United States v. Herman, 589 F.2d 1191, 1198 (3d Cir. 1979). As we explained in J&R Ice Cream, "[t]his method of proving identity through the use of [Rule 404(b) evidence] is sometimes labeled proof of modus operandi and distinguished from the use of a common plan or scheme to prove identity." J&R Ice Cream, 31 F.3d at 1269 n.9

(internal quotation marks omitted).9

_____

9. Wright & Graham's treatise distinguishes between evidence admitted on the basis that it proves the existence of a "plan" from evidence admitted on the theory that it shows a unique modus operandi, hence establishing the actor's identity. 22 Wright & Graham, supra S 5244, at 501-02. Their treatise suggests that proof of an actor's modus operandi should not be admitted on the theory that the striking similarities between the uncharged act and the subsequent act and their unique features demonstrate the actor's "plan." Rather, their treatise suggests that Rule 404(b) evidence which can be considered proof of the actor's modus operandi should be admitted based on "the exception for use of other crimes evidence to prove identity." Id.  at 502.

Weinstein's treatise provides an instructive explication of the rationale supporting the admission of Rule 404(b) evidence as proof of the actor's modus operandi :

> Other-crime evidence may be admitted if the evidence of the other crimes is so distinctive that it can be seen as a `signature' identifying a unique defendant, such as the infamous Jack the Ripper. Thus, the issue in these cases is whether the defendant committed the act at all, unlike in intent cases, in which the issue is whether the defendant had the requisite state of mind when he or she committed the act. There are many instances in which the details of the other crime show an individuality that is highly probative of the conclusion that the charged crime was committed by the same person.
>
> . . . [E]vidence of the commission of the same type of crime is not sufficient on this theory unless the particular method of committing the offense, the modus operandi (or m.o.) is sufficiently distinctive to constitute a signature. Other crimes evidence is not permissible to identify a defendant as the perpetrator of the charged act simply because he or she has at other times committed the same garden variety criminal act, since this would be identification based on the forbidden inference of propensity. The question for the court is whether the characteristics relied on are sufficiently idiosyncratic to permit an inference of pattern for purposes of proof.

2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence 2d S 404.22[5][c], at 404-117 to 404-120 (1999). Thus, under this theory, the evidence is admitted for the purpose of establishing that the defendant actually committed the act for which he is charged, and its

admission into the case normally arises in the criminal
context where there is a question as to the identity of the
perpetrator of the crime. See Pinney, 967 F.2d at 916; see
also, e.g., United States v. McGuire, 27 F.3d 457, 461 (10th
Cir. 1994) (admitting testimony concerning eight other
robberies with which defendant allegedly was involved;
court found that robberies had "many common
characteristics which would tend to show that the

defendant was involved in the [instant] robbery and that
the latter robbery was but a part of a larger common
scheme or plan."); 2 Weinstein & Berger, supra S 404.22[4],
at 404-102 (noting that courts "sometimes admit, in the
name of identity, evidence of a crime that has some
unusual features as the charged crime . . . .").

We understand the district court's admission of the
Seaver evidence as predicated on its theory that the
similarity between the two events--the alleged fabrication of
performance problems to facilitate Seaver's dismissal and
the alleged fabrication of customer complaints to support
Becker's termination--demonstrated ARCO's modus
operandi, which in turn could establish circumstantially a
fact in issue--namely, whether ARCO fabricated reasons in
order to facilitate Becker's dismissal. See Becker I, 15 F.
Supp.2d at 614 ("[T]he lies Becker was allegedly asked to
tell, i.e., lies about the quality of Mr. Seaver's work, were
similar to the reasons cited by ARCO for Becker's
termination."). Indeed, a review of the colloquy between the
court and counsel concerning the admissibility of this
evidence and the purpose for which it was proffered
confirms that the district court predicated its ruling on its
belief that the similarities between what allegedly occurred
in Seaver's case and what allegedly transpired in
connection with Becker's termination were sufficient to
establish a pattern of conduct on ARCO's part which
suggested that it fabricated reasons to justify Becker's
dismissal.

But there are two problems with admitting the Seaver
evidence on the theory that it establishes ARCO's pattern,
practice or modus operandi: identity was not a disputed
issue in this case, and it cannot be argued successfully
that the similarities between the two events show a unique
or distinctive modus operandi. Compare J&R Ice Cream, 31
F.3d at 1269; Pinney, 967 F.2d at 917. Indeed, with respect
to the first issue, the parties only disputed whether ARCO
indeed fabricated Becker's alleged performance deficiencies
and encouraged customer complaints in order to legitimize
an otherwise improper dismissal. In other words, the
parties disputed whether the alleged act (the fabrication of

problems in Becker's case) even occurred, not whether

38

ARCO, as opposed to some other person or entity,
committed it. Compare J&R Ice Cream, 31 F.3d at 1269
(identity of actor was not in dispute; rather, issue was
whether the subsequent act occurred); United States v.
LeCompte, 99 F.3d 274, 278 (8th Cir. 1996) (same); United
States v. Shackleford, 738 F.2d 776, 783 (7th Cir. 1984)
(same) (overruled on other grounds, Huddleston v. United
States, 485 U.S. 681, 108 S.Ct. 1496 (1988)).

Despite this obvious distinction, it is clear that the
evidential fact that Becker, the proponent of the Rule 404(b)
evidence, sought to prove was the same--that ARCO indeed
committed a particular act that is disputed in this case.
Moreover, as in the case where the government introduces
Rule 404(b) evidence to establish the actor's identity by
modus operandi, Becker contended that the similarities
between the prior and subsequent acts provided a sufficient
foundational basis to establish the actor's "plan," and
hence the commission of the subsequent act itself. See 2
Weinstein & Berger, supra S 404.22[5][c], at 404-119 to 120
("The question for the court [in admitting prior acts on the
theory that they are so distinctive to as to identify the
defendant as the perpetrator of the crime] is whether the
characteristics relied on are sufficiently idiosyncratic to
permit an inference of pattern for purposes of proof."); see
also Edward J. Imwinkelried, Using a Contextual
Construction to Resolve the Dispute over the Meaning of the
Term "Plan" in Federal Rule of Evidence 404(b) , 43 U. Kan.
L. Rev. 1005, 1007-08 (1995) ("Imwinkelried II") ("The
prosecutor would point to as many similarities as possible
between the charged crime and the . . . uncharged offenses.
Indeed, there is a good deal of authority that standing
alone, proof of an accused's commission of recent, similar
crimes is sufficient foundational proof of the existence of a
`plan.' ").

In this sense, then, Becker pointed to the Seaver evidence
and argued that ARCO had developed a distinct strategy
that it followed in terminating its unwanted employees
which made it more likely that it adhered to its plan in
terminating Becker. Compare Gastineau v. Fleet Mortgage
Corp., 137 F.3d 490, 495 (7th Cir. 1998) (where parties
disputed authenticity of employer's memorandum

39

indicating that plaintiff was terminated for discriminatory
reasons, court of appeals upheld admission of evidence

showing that in prior litigation with his employer, plaintiff produced a contract that the employer denied ever signing; court determined that evidence established that plaintiff had "a common scheme or plan in disputes with his former employers-creating false documents in anticipation of litigation"); United States v. Baker, 82 F.3d 273, 276 (8th Cir. 1996) ("[The witness] testified to a remarkably similar series of prior actions by [the defendant]: a motorist is stopped for speeding, a firearm is discovered, and the motorist is given the choice of facing charges or`working it out' with [the defendant].").

Thus, as we see it, the dispositive question in this case is whether Rule 404(b) permitted Becker to introduce evidence of one alleged similar instance of prior conduct by ARCO's supervisory employee to establish ARCO's"plan" (otherwise described as its pattern, practice or"common design") and hence the commission of a similar subsequent act by a different ARCO employee, where the identity of the actor is not an issue and the similarities between the two events are not sufficient to show a distinct modus operandi.10

_____

10. Certain commentators suggest that courts often (and improperly) conflate the two theoretical underpinnings for admissibility of Rule 404(b) evidence under the label of a "common scheme or plan." For example, courts have admitted Rule 404(b) evidence to establish the defendant's purported pattern of conduct that suggests the defendant committed the subsequent act, even where the issue is not identity of the perpetrator, and/or the prior events are not sufficiently distinct to qualify as evidence of "modus operandi." Imwinkelried's treatise thus explains:

> Some courts are quite liberal in admitting uncharged misconduct under the rubric of `plan.' If the proponent can show a series of similar acts, these courts admit the evidence on the theory that a pattern or systematic course of conduct is sufficient to establish a

> plan [which in turn establishes the commission of the act]. Similarity or likeness between the crimes suffices. In effect, these

> courts convert the doctrine into a plan-to-commit-a-series-of-similar-crimes theory.

> . . . .

40

Compare Jankins v. TDC Management Corp., 21 F.3d 436, 440-41 (D.C. Cir. 1994) (reversing jury finding in favor of plaintiff who introduced Rule 404(b) evidence of defendant's

alleged failure to pay subcontractors on the theory that it
_____

       In these cases, the similarity between the crimes is ordinarily
       inadequate to satisfy the modus operandi doctrine. . . .

       In reality, these courts are arguably permitting the proponent to
       introduce propensity evidence in violation of the prohibition in
the

       first sentence of Rule 404(b). Proof of a number of similar
burglaries
       . . . may be probative of the defendant's status as a professional
       criminal; and the similarities may tend to show that when faced
       with similar, random opportunities for committing a crime, the
       defendant repeatedly chooses to use roughly the same methodology.
       However, if the similarities are insufficient to establish modus
and

       there is no inference of a true plan in the defendant's mind, the
       proponent is offering the evidence on a forbidden theory of logical
       relevance.

Imwinkelried I, supra S 3:24, at 128-29 (footnotes omitted); see also 1
Mueller & Kirkpatrick, supra S 113, at 667 (explaining the admission of
Rule 404(b) evidence on the theory that it establishes the defendant's
plan or scheme, and hence the defendant's commission of the
subsequent act, and noting "[i]t is not enough that other crimes
resemble the charged crime. If they are not sufficiently similar to the
charged offense or not distinctive enough to be admitted to show modus
operandi (hence identity), admitting other crimes to show plan or scheme
merely because they bear some resemblance to the charged offense
cannot be defended."); see also 22 Wright & Graham, supra S 5244, at
482-83 (West Supp. 1999) (where court admitted evidence in statutory
rape case showing that in two previous instances, the defendant
similarly enticed victims (who all were runaways) into exchanging sex for
food and shelter, commentators suggested that court erred because prior
similar instances were "evidence of propensity, not plan"; "To say that
the defendant had a `plan' to seduce every runaway he could may not do
violence to the language but it does undermine the policy of Rule 404(b)
by permitting the use of propensity to prove conduct."). But see II
Wigmore, supra S 304, at 249 ("When the very doing of the act charged
is still to be proved, one of the evidential facts receivable is the
person's
design or plan to do it. . . . The added element[in these circumstances],
must be, not merely a similarity in the results, but such a concurrence
of common features that the various acts are naturally to be explained as
caused by a general plan of which they are the individual
manifestations.").

41

demonstrated a common scheme or plan by which the

defendant systematically committed fraud; court found that the prior instances were dissimilar and temporally remote from plaintiff 's and defendant's dispute and could not be admitted on that theory, or to show the defendant's intent) (citing, inter alia, I Wigmore, Evidence S 304, at 202-03 (3d ed. 1940)).

Contrary to the district court's legal conclusion on this point, see Becker I, 15 F. Supp.2d at 614, we hold that standing alone, the similarities between the Seaver evidence and the allegations of fact in this case do not provide a sufficient foundation from which the existence of ARCO's "scheme or plan" of fabricating reasons in terminating its employees may be inferred so as to justify admitting the Seaver evidence on that basis. We cannot agree that the "plan" exception listed in Rule 404(b) supports the admission of the Seaver evidence to show that ARCO engaged in a similar impropriety in Becker's case simply by virtue of the "similarity" between the two alleged events. Consequently, we find, notwithstanding contrary protestations, that the district court admitted the evidence for "exactly the purpose that Rule 404(b) declared to be improper, . . . namely, to establish the defendants' propensity to commit the charged act." See J&R Ice Cream, 31 F.3d at 1269 (internal quotation marks and citation omitted); see also Herman, 589 F.2d at 1198 (finding that district court erred in admitting testimony that defendant engaged in similar extortion scheme which was unrelated to extortion scheme with which he was charged; court found that testimony did not demonstrate that the similarities were so distinctive so as to justify an inference that the defendant participated in both transactions, and modus operandi "was at best a collateral issue in the case"; "What was centrally in issue was whether [the defendant] was the kind of person who would take a bribe.") (citing Rules 404(b) and 403); State v. G.V., 744 A.2d 137, 142 (N.J. 2000) (per curiam) (in prosecution of father for, inter alia, sexual assault against his daughter, court found that the trial court erred in admitting evidence of father's prior sexual molestation of his other daughter at the same time of the day (evening) and at about the same age as the victim; prosecutor's summation alluded to the fact that

42

evidence demonstrated a "[s]imilar fact pattern," and showed "the way he operate[d]," and court observed "If that is not an allusion to propensity, then we do not know what would be.").

We find support for our conclusion in this regard in our opinion in J&R Ice Cream, 31 F.3d at 1268-69, where we addressed the evidentiary use of similar uncharged acts of

misconduct to demonstrate a scheme or plan under Rule 404(b). There the plaintiff, J&R Ice Cream Corp., a former franchisee, sued the defendants/franchisors, collectively referred to as defendant "California Smoothie," under the New Jersey Consumer Fraud Act ("the Act"). 11 After terminating its franchise rights, J&R Ice Cream sued California Smoothie because it sustained losses in connection with a California Smoothie store it opened in a mall in Florida. J&R Ice Cream obtained a jury verdict in its favor, based on its theory that California Smoothie violated the Act by making certain representations to it during franchise negotiations. Specifically, the jury found that California Smoothie violated the Act by, inter alia, (1) misrepresenting the amount of J&R Ice Cream's potential gross sales in its first operation of a California Smoothie franchise, and (2) misrepresenting California Smoothie's expertise in selecting profitable locations for franchises, and in choosing the Florida site for J&R Ice Cream's store. See id. at 1265.

On appeal, California Smoothie challenged the district court's admission of the testimony of two unrelated former California Smoothie franchisees as to misrepresentations California Smoothie allegedly made to them. Specifically, the district court permitted J&R Ice Cream to introduce testimony that California Smoothie made similar representations to the other two franchisees regarding the sales and profits a California Smoothie franchise would produce. See id. at 1268. While the district court originally admitted the testimony to establish California Smoothie's

_____

11. The plaintiff also asserted a common law negligence claim based on the defendant's alleged negligence in selecting a poor site for plaintiff's franchise and its negligence in negotiating the lease there. See J&R Ice Cream, 31 F.3d at 1264.

"intent" and "common scheme or plan," it later determined that the testimony was admissible under Rule 404(b) as evidence of California Smoothie's "plan," i.e., "common scheme or business practice of representing sales and profit figures to potential franchisees." See id.

We held that the district court erred in admitting this testimony under its theory that it tended to establish California Smoothie's scheme, plan or pattern of representing sales and profit figures in order to induce potential franchisees to acquire a California Smoothie franchise. We began our analysis of the issue of the admissibility of this testimony under Rule 404(b) with the

statement that, contrary to the district court's determination, the "testimony was not admissible as evidence of a common scheme or plan." See id.  In support of that conclusion, we outlined the basic theories for admitting Rule 404(b) evidence under the rationale that such evidence demonstrates the defendant's common scheme or plan. See id. at 1269. After explaining that the evidence was not relevant to an ultimate issue in the case such as motive, identity or intent because those issues were undisputed, we concluded that the "evidence was admitted for exactly the purpose Rule 404(b) declared to be improper, . . . namely to establish the defendant's propensity to commit the charged act." Id.  (internal citation and quotation marks omitted).

After reviewing the possible theories offered in support of the district court's ruling, we ultimately held that the court's admission of this evidence was reversible error. Importantly, in reaching our conclusion, we found the district court's comments particularly relevant because the court had acknowledged that it admitted the prior testimony for an improper purpose when it stated that " `[i]n the context of this case, I believe that it was proper to show that it was more likely that representations of sales figures were made to . . . [J&R Ice Cream] by demonstrating that the officials of California Smoothie had a practice of making such representations.' " Id. (alteration in original) (quoting from district court record). Thus, J&R Ice Cream  rejected the district court's conclusion that the testimony was admissible under Rule 404(b) as evidence of California

44

Smoothie's "business practice," i.e., its pattern, scheme or plan of representing sales and profit figures to potential franchisees, for the specific purpose of showing that California Smoothie made the same sort of representations to the plaintiff.

Just as in J&R Ice Cream, the district court admitted the Seaver evidence to establish a contested material fact based only on the similarity of the prior event to a subsequent, unrelated occurrence which was alleged to have happened in Becker's case. Here, the district court admitted the Seaver evidence on the theory that it was more likely that ARCO fabricated its purported nondiscriminatory reasons for terminating Becker if ARCO's management had a pattern or practice of inventing performance problems in order to facilitate the termination of other employees. See app. at 3225–28 ("It's not being offered to say that Mr. Victor is a bad person because he had—he had done this in the past. It's being offered to show a pattern, or habit. . . . I mean it seems to me that in this case the event is nearly

identical and as such it would be probative of plan . . . I would agree with you if it had to do with some other conduct that is not probative, but we have allegedly the same case. . . ."). Moreover, as in J&R Ice Cream, the district court admitted the Seaver evidence because, in its view, the evidence mirrored Becker's version of the events leading up to his discharge, thus tending to corroborate Becker's theory of his case. Compare J&R Ice Cream, 31 F.3d at 1269 (holding that district court abused its discretion in admitting evidence on the theory that it showed that "it was more likely" that the defendant made similar representations to the plaintiffs, where representations formed in part the factual basis for the jury's finding on the consumer fraud count against defendant).

We believe that the district court's rationale for admitting the Seaver evidence mirrors in all material respects the district court's reasoning that we expressly rejected in J&R Ice Cream. Compare app. at 3230 ("The point is that [Becker's] testimony is [allegedly] exactly what is happening in this case, I was asked to do it before, that goes to motive, intent and practice.") (emphasis added); app. at 3225 ("It's

45

being offered to show a pattern, or habit.") with J&R Ice Cream, 31 F.3d at 1269 ("I believe that it was proper to show that it was more likely that representation of sales figures were made to [plaintiff] by demonstrating that [defendant] had a practice of making such representations.") (emphasis added). Thus, our opinion in J&R Ice Cream leads us to the inescapable conclusion that the district court erred in admitting the Seaver evidence on the theory that it established ARCO's common scheme, plan or pattern of action. It is obvious in view of J&R Ice Cream that Becker introduced the Seaver evidence for an improper purpose-- solely to establish ARCO's propensity to fabricate reasons to justify terminating its employees so that the jury would conclude that ARCO did the same thing when it dismissed Becker. We believe that the not so hidden message behind Becker's testimony regarding the Seaver incident essentially was that because ARCO did it once, it was likely that it did it again. But as we previously have admonished,"[t]his type of inference is precisely the kind prohibited by Rule 404(b)." Pinney, 967 F.2d at 917.

Becker contends that our opinion in J&R Ice Cream is factually distinguishable and therefore does not compel the conclusion that the district court erred in admitting the Seaver evidence. He argues specifically that we predicated our analysis in J&R Ice Cream on our finding that California Smoothie's business practice of representing

potential profits was not admissible to prove California Smoothie's intent because intent was not an essential element to a claim under the Act. See J&R Ice Cream, 31 F.3d at 1268.

We need not tarry on this argument, however, as it does not address that aspect of our opinion in J&R Ice Cream which is dispositive here. It is true that in J&R Ice Cream we ruled that evidence of California Smoothie's "business practice" was not admissible to establish its intent because intent was not an essential element of the claim at issue. But we further determined that the district court should not have admitted the testimony of the other franchisees on the theory that it established California Smoothie's business "plan" because it did not satisfy the criteria for admitting evidence under that exception in Rule 404(b). It

46

is the latter aspect of the reasoning in J&R Ice Cream which we find determinative. Indeed, parallel with our conclusion with respect to the disputed evidence in J&R Ice Cream, we have determined that the Seaver evidence was not admissible for the express purpose of proving ARCO's intent to discriminate against Becker, and our finding in that regard thus has required us to consider whether it could be admitted under the "plan" exception listed in Rule 404(b). And to the extent that the plaintiff in J&R Ice Cream sought to establish the same type of contested evidential fact through the admission of a similar form of "business practice" evidence, our analysis there clearly compels our conclusion that the Seaver evidence is not admissible as proof of ARCO's common scheme, plan, pattern or modus operandi of fabricating performance problems in terminating its employees.

We also point out that the district court stated that it believed that the evidence was admissible under the theory that it tended to show ARCO's "habit" when confronted with the task of having to terminate its employees. App. at 3225–26. It thus appears that the district court confused the concepts of "modus operandi" and "habit or practice," the latter of which is addressed in Rule 406, which provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

The Advisory Committee Notes provide an instructive explanation of the theoretical basis for this rule:

Character and habit are close akin. Character is a generalized description of one's disposition, or of one's disposition in respect to a general trait, such as honesty, temperance, or peacefulness. Habit, in modern usage, both lay and psychological, is more specific. It describes one's regular response to a repeated specific situation. . . . A habit [ ] . . . [ ] is the person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the

47

habit of going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn, or of alighting from railway cars while they are moving. The doing of the habitual acts may become semi-automatic.

Fed. R. Evid. 406 advisory committee's note (internal quotation marks omitted); see also 1 McCormick, supra S 195, at 826 ("By and large, the detailed patterns of situation-specific behavior that constitute habits are unlikely to provoke such sympathy or antipathy as would disturb the process of evaluating the evidence.").

Clearly, Rule 406 does not support the introduction of the Seaver evidence on the basis that it was ARCO's "habit" to fabricate reasons for terminating its employees. The Seaver evidence did not show ARCO's "regular response to a specific situation," as the nature of the alleged conduct—the fabrication of reasons to justify its employees' dismissals—is not the sort of semi-automatic, situation-specific conduct admitted under the rule. Moreover, the Seaver evidence ostensibly showed only, at best, one other instance in which ARCO exhibited its alleged repetitive behavior.

Finally, Becker contends that even if the court erred in admitting the evidence pursuant to Rule 404(b), the evidence was admissible under Rule 608(b). Appellee Becker's Br. at 37-38 & n.10. Nevertheless, as ARCO correctly points out, Rule 608(b) does not provide a basis for admitting this testimony, inasmuch as the plain language of the first sentence of the Rule prohibits the introduction of extrinsic evidence to prove specific instances of a witness's conduct for the purpose of attacking the witness's credibility.12 See United States v. Davis, 183 F.3d

_____

12. Rule 608(b) provides (emphasis added):

(b) Specific instances of conduct. Specific in stances of the conduct

> of a witness, for the purpose of attacking or supporting the witness'
> credibility, other than conviction of crime as provided in rule 609,

> may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

48

231, 257 (3d Cir.) (discussing distinction between Rules 404(b) and 608(b) and finding that "Rule 608(b) applies because the government did not introduce extrinsic evidence about these other acts [by the testifying witness]; all it did was ask [the witness] about them"), as amended, 197 F.3d 662, 663 & n.1 (3d Cir. 1999). The Seaver evidence clearly qualifies as extrinsic evidence, whether we assume that Becker introduced it to contradict Victor's testimony concerning the events which allegedly transpired at the meeting in August 1990, or alternatively, to impeach ARCO's suggestion through its witnesses that it retained its older workers. In either event, Rule 608(b) does not support the admission of the testimony, and we cannot uphold the district court's ruling on that alternative basis.

As the foregoing discussion demonstrates, we have considered each of the various rationales the district court proffered in connection with its ruling on the Seaver evidence, but have determined that none supports the admission of Becker's testimony on this point. We hold, therefore, that the district court abused its discretion in admitting the Seaver evidence. In view of our finding in this regard, we need not consider whether the evidence was admissible under the balancing analysis contemplated by Rule 403.

Despite the district court's error in admitting the evidence under Rule 404(b), we would not be required to reverse and remand for a new trial if we could find that the court's admission of Seaver evidence was harmless. As we have indicated, a finding of reversible error "may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." See Glass, 34 F.3d at 191 (internal quotation marks omitted). "In reviewing evidentiary rulings, if the Court finds nonconstitutional error in a civil suit, such error is harmless only if it is highly probable that the error did not affect the outcome of the case." Id. (internal quotation

marks omitted); see also McQueeney, 779 F.2d at 924-25 (stating that standard we adopted in Government of the Virgin Islands v. Toto, 529 F.2d 278, 284 (3d Cir. 1976), governs harmless error determination in civil and criminal cases).

At oral argument, Becker's counsel contended that if the district court's evidentiary ruling was incorrect, the error was harmless. Becker also pointed out that the court provided a jury instruction, which we have reproduced in its entirety above, that outlined the purposes for which the Seaver evidence could be considered.

In response, ARCO countered that its admission was far from harmless, inasmuch as this evidence was particularly powerful and damaging to ARCO given its defense strategy. It also pointed out that Becker's position before us--that the testimony was insignificant in light of the other evidence in the record--clearly was undermined by the fact that Becker's attorneys repeatedly sought its admission during the course of the trial.

We have reviewed the entire record in this case, and we conclude that ARCO has the better argument here. First, we note that the jury instruction the district court provided concerning the proper uses of the Rule 404(b) evidence does little to convince us that the district court's error was harmless in the circumstances. In Sampson, we found that the district court's jury instruction concerning the proper uses of Rule 404(b) evidence provided inadequate guidance to the jury on that point because it "simply repeat[ed] the entire litany of permissible theories under Rule 404(b)," and failed to limit the government to the theories it proffered in support of admission of the evidence. 980 F.2d at 889. Here, the district court's instruction is just as troublesome as the one we addressed in Sampson, inasmuch as it suffers from identical deficiencies. In our view, these problems in the jury instruction certainly increase the likelihood that the jury utilized this evidence for an improper purpose-namely, to find ARCO liable based on an impermissible inference concerning ARCO's "character" and its propensity to fabricate or "trump up" problems with its employees. Thus, the jury instruction the district court provided here hardly supports Becker's harmless error argument. See also State v. Fortin, No. 1-95/96 Sept. Term 1998, 2000 WL 202643, at *9 (N.J. Feb. 23, 2000) (when Rule 404(b) evidence is admitted the trial court should give a specific charge with reference to the factual content of the case so that the jury may understand the purposes for

which the evidence may be considered); G.V., 744 A.2d at 144 (rejecting harmless error argument and observing that "even if the evidence had been admissible on the subsidiary issues in the case, the charge in this case left the jury wholly unguided as to how to use the evidence for such limited purposes").

Moreover, quite apart from the lack of real guidance in the jury instruction, given its nature, we do not believe that it can be argued successfully that the district court's error in admitting the Seaver evidence was harmless. Just as we found in J&R Ice Cream with respect to the Rule 404(b) evidence there, the Seaver evidence clearly was prejudicial because it portrayed ARCO as an organization engaged in a scheme to get rid of its unwanted employees by lying to them and falsifying complaints and other performance problems to facilitate the disfavored employees' dismissals. Also, the evidence was particularly damaging given the theory of Becker's case--that his alleged performance problems were fabricated and that the customer complaints were "inaccurate" and "misleading." Furthermore, ARCO's seemingly cruel way of dismissing Becker, a long-time employee, could not have endeared it to the jury, thus making the Seaver evidence all the more damaging. Indeed, the district court noted the significance of the Seaver evidence and its value to the plaintiff 's case, app. at 3229 ("I don't think there will be any stronger evidence"), and Becker's counsel spent a significant time in her closing argument explaining her theory as to how this evidence proved Becker's case against ARCO.13

_____

13. Seizing on this evidence, admitted on the last day of trial, plaintiff 's
counsel made the following comments in her closing:

>    Now, we've also relied on other evidence, not just the
>    inconsistencies and contradictions. That's one part of it. If their
>    position is inconsistent or contradictory, you canfind that's
pretext.
>    Well, what's the evidence of pretext? We can rely on comments from
>    individuals as well.
>
>    . . . .
>
>    Now, in 1990 Dr. Ramey asked Mr. Becker to agree with him that
>    another individual's work, [Linwood] Seaver, was bad. Mr. Becker

51

Given these circumstances, we cannot say with

confidence that it is "highly probable that the error did not substantially affect" ARCO's rights. J&R Ice Cream, 31 F.3d at 1269 (citing Lippay v. Christos, 996 F.2d 1490, 1500 (3d Cir. 1993)). To the contrary, the most we can say after reviewing the record is that even without the Seaver evidence, it would have been sufficient to support a verdict in Becker's favor and that he would have had a reasonable chance of obtaining that verdict.14 Accordingly, we are left

_____

> didn't do that. He didn't agree to lie. He wouldn't. And Mr. Victor was present during that meeting. Mr. Victor was there, and his presence there has some meaning. He was a participant by his silence, by his being there. Just like if you said, I'm going to kill so and so and there's two people involved and one of them doesn't say anything. Well, Mr. Victor was there and Mr. Becker refused to lie for Dr. Ramey.
>
> And you heard his testimony. I'm going to fire him anyway, he's terminated. It doesn't matter if he did good work, just like it doesn't matter if Mr. Becker did good work. The same type of plan, the same type of operation. Mr. Victor couldn't recall, couldn't remember. I don't know, I don't recall, I don't remember. How many times did he say that? Very selective memory. That's very important.
>
> Mr. Becker refused to go along with it. And you know what, Mr. Victor said, Mr. Becker doesn't lie. You heard him say that. He never lied to him. He's known to him to be a truthful person.

App. at 3268–69. Later in the closing, Becker's counsel stated:

> In addition, the comment about asking Mr. Becker to lie about Mr. Seaver's work so they could fire him in a similar manner. This, together with the prima facie case we submit, please, shows that age played a role in Mr. Becker's firing, and of course, his rejection of that early retirement offer where he was targeted.

App. at 3279.

14. As we have indicated in note 3, supra, ARCO does not argue in this appeal that it is entitled to judgment as a matter of law pursuant to Rule 50 based on the sufficiency of Becker's evidence of age discrimination. We also point out here that ARCO does not contend that we should instruct the district court to enter a judgment in its favor based on the insufficiency of the remaining, properly admitted evidence concerning ARCO's liability for age discrimination. See Weisgram v. Marley Co., 120

with no alternative but to reverse the district court's denial of ARCO's post-trial motion insofar as it requested a new trial on all issues, and remand the matter to the district court with directions to grant a new trial on the federal and state age discrimination claims.

V. CONCLUSION

We conclude with the following observation. The proceedings in this matter and in Morley as well as other cases we have cited demonstrate that great care must be taken when a party offers Rule 404(b) evidence. The rule is not easy to apply and its misapplication may lead to a significant waste of the parties' and the court's time. Indeed, in this case the result might have been the same without the Seaver evidence. The important point is that a party cannot justify admission of Rule 404(b) evidence merely by reciting in conclusory terms that the evidence is admissible under that rule.

For the foregoing reasons, we are constrained to hold that the district court erred in admitting the Seaver evidence, and that we cannot say that ARCO's substantial rights were not affected. Accordingly, we will reverse the district court's order of June 30, 1998, insofar as it denied ARCO's motion for a new trial under Rule 59(a), and will remand the matter to the district court with directions to grant a new trial on all issues pertaining to the age discrimination claims. Moreover, inasmuch as we have determined that a new trial in its entirety is warranted, we dismiss Becker's cross-appeal as moot.

_____

S.Ct. 1011, 1022 (2000) ("We . . . hold that the authority of courts of appeals to direct the entry of judgment as a matter of law extends to cases in which, on excision of testimony erroneously admitted, there remains insufficient evidence to support the jury's verdict."). In any event, our review of the record and the remaining evidence presented at trial confirms that ARCO is not entitled to a judgment in its favor at this

juncture.

53

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit